# IN THE COURT OF APPEALS OF IOWA

No. 21-1738
Filed April 13, 2022

**IN THE INTEREST OF Z.S., A.A., and T.A.,**
**Minor Children,**

**B.W., Mother,**
      Appellant,

**T.A., Father,**
      Appellant.

_____

Appeal from the Iowa District Court for Polk County, Kimberly Ayotte Renze, District Associate Judge.

A mother and a father separately appeal the termination of their parental rights. **AFFIRMED ON BOTH APPEALS.**

Teresa M. Pope of Branstad & Olson Law Office, Des Moines, for appellant mother.

Cathleen Siebrecht of Siebrecht Law Firm, Des Moines, for appellant father of A.A. and T.A.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Kayla Stratton, Des Moines, attorney and guardian ad litem for minor children.

Considered by Bower, C.J., and Vaitheswaran and Chicchelly, JJ.

**BOWER, Chief Judge.**

The mother of three children—Z.S., A.A., and T.A.—and the father of A.A. and T.A. separately appeal the termination of their parental rights.[1]  The mother contests the grounds for termination, asserts the court should have allowed her additional time, termination is not in the children's best interests, and argues the court erred in denying her request to place all three children in a guardianship with the maternal grandparents.  The father asserts the court should have granted him additional time to seek reunification and argues termination of his rights was not necessary because his children are safe in their placement with the paternal grandparents.  We affirm on both appeals.

**I. Background Facts.**

Brooke is the mother of all three children: T.A. born in 2012, A.A. born in 2013, and Z.S. born in June 2020.  Thomas is the father of the older two children.  Terrell is the putative father of Z.S.  Domestic violence occurred in Brooke's relationships with both fathers.

On May 21, 2020, the department of human services (DHS) began investigating concerns Brooke and Terrell were abusing opiates while caring for A.A. and T.A. and that Terrell had physically assaulted Brooke in front of the children.  Brooke initially avoided DHS but finally agreed to provide a drug screen; she failed to follow through with the drug screen and continued to avoid DHS.

---

[1] Terrell, the putative father of Z.S., did not participate in scheduled paternity testing and did not participate in any services offered to the family.  He does not appeal.

On May 26, Brooke completed a substance-abuse evaluation at UCS Healthcare in which she reported she had been abusing prescription pain pills, got pregnant, and realized she could not stop taking opioids. She reported using opiates for six months to a year, with the longest period of abstinence being only three days; she reported using as frequently as three times daily. A drug screen taken that day was negative for all substances. Brooke was diagnosed with Opioid Use Disorder, Severe, and was recommended to participate in extended outpatient treatment and Medically Assisted Treatment (MAT).

On May 29, DHS was able to speak to Brooke, after showing up at the house unannounced. Brooke reported she had been in treatment for a while and agreed to provide a drug screen that day. The record does not indicate whether Brooke actually did so.

When Z.S. was born in early June, a nurse reported Terrell had been at the hospital with Brooke and Z.S., sleeping in her room with the baby. There was a no-contact order in effect between Brooke and Terrell. Brooke first denied his presence but later acknowledged he had been at the hospital. She denied using opioids during her pregnancy and claimed a sweat patch she had put on at DHS's request was tampered with. Z.S. tested positive for methadone at birth.

DHS spoke with UCS to confirm Brooke's participation in services and found Brooke had missed an orientation session and her next appointment after her evaluation. UCS session notes from June 17 indicate Brooke was informed she needed to meet with her counselor by June 18 or she would be out of compliance with the MAT program. Brooke's treatment counselor reported to DHS Brooke would not be able to continue dosing—obtaining dialing methadone doses—until

she met with the counselor. Brooke did not cooperate with DHS's attempt to develop a safety plan, and DHS sought temporary removal.[2]

Brooke and the children were located at the maternal grandparents' home. A law enforcement officer accompanied DHS workers to the residence. The officer called for backup assistance. The juvenile court describes the removal process:

> Brooke and her parents . . . were not cooperative with DHS in executing the removal. The police body cam video demonstrates that Brooke and her family were extremely belligerent and highly agitated. The body camera footage was offered as an exhibit at the termination hearing and is extremely disturbing. The children were present and were clearly distraught by the screaming and yelling that was occurring. DHS remained calm throughout the process, despite the reactions of Brooke and her family. A police officer can be heard saying that the family was telling the children they would be abused in foster care.

[2] The June 18, 2020 affidavit submitted in support of temporary removal states:
The circumstances surrounding the need for removal are: The mother is involved in a violent relationship . . . . The couple have a no-contact order because of domestic violence related reasons but the couple knowingly violate that order. On or about May 21, 2020, the DHS received allegations that the couple were abusing opiates while they cared for [T.A. and A.A.]. The DHS met with the mother on May 20, 2020, but she refused to provide a drug screen. It would be later learned that on May 26, 2020, the mother sought treatment at UCS and was prescribed methadone. On May 29, 2020, the mother agreed to a drug screen patch. Then, [in June], [Z.S.] was born positive for methadone. It's reported that the mother's doctor was unaware of the mother's methadone treatment; and soon after, the mother said that her drug screen patch fell off. Records indicate that [Terrell] visited the mother at the hospital, although the mother was not forthright with that information. Since [Z.S.] was discharged from the hospital, the mother missed the follow up appointment with his pediatrician, the mother missed appointments with UCS and the mother refuses to communicate or cooperate with the DHS regarding the welfare of these children. The mother and relatives will not coordinate a safety plan for these children and it's reported that the mother may be dropped from the UCS treatment program for failure to meet. Also, when evaluated at UCS, the mother reported that [she] abused prescription pain killers multiple times a day for approximately six months before she learned she was pregnant with [Z.S.]

A contested removal hearing was held on June 29 and July 7. The court confirmed the removal and continued the children in foster care with custody with DHS. The court found issues of domestic violence and Brooke's minimization of her substance abuse created risks of inadequate supervision of the children.

*Adjudication and Disposition.* After an August 4 contested adjudication hearing, the court found T.A. reported witnessing domestic violence between Brooke and Terrell on a number of occasions. One time, T.A. called 911, but Brooke got on the line and reported everything was fine. Brooke denied ever exposing the children to domestic violence or violating the no-contact order. The court found Brooke was not credible regarding her relationship with Terrell or the domestic violence, which placed the children at imminent risk of suffering physical abuse and neglect. The court also found Brooke continued to minimize her substance-use disorder and was not in full compliance with MAT, placing her at greater risk of relapse. The children were adjudicated children in need of assistance (CINA). The court ordered Brooke to provide drug screens at the request of DHS and participate fully in her MAT. Brooke and Terrell were ordered to participate in domestic-violence services. DHS was to assess family members for potential placement of the children.

On August 13, the court modified T.A. and A.A.'s placement from DHS foster care into the custody of their paternal grandparents.[3] They have remained

---

[3] T.A. and A.A. were initially placed in the same home with Z.S. but the foster family expressed concerns because A.A.'s behaviors endangered their four-year-old child.

in the paternal grandparents' care and Z.S. has remained in the care of the foster family.

*Review.* A review hearing was held on November 6. Neither father appeared or was participating in services. Brooke was participating in MAT but was not attending all required programing. The court also ruled Brooke needed to engage in Child-Parent Psychotherapy (CPP) with the children, sign necessary releases so the children could participate in services, and consistently attend her family interactions.

The maternal grandparents filed a motion to intervene and sought to have the children placed with them. The court set the motions for consideration at the next review hearing.

On March 22, 2021, the court issued its review order. The court noted "Thomas believes his children should be placed with his father until he moves into his own place." The court made these findings:

> 8. There is a little progress being made. In January 2021, there were positive drug screens without admission of use by Brooke. The mother had missed some dosing, and Brooke was not fully compliant with MAT expectations. Brooke has been slow to engage with CPP services with the children. As of March 2021, Brooke was not consistently attending CPP with [Z.S.] due to her lack of consistency in her own individual therapy. [A.A.]'s therapist recommends that Brooke participate in a parent only session with her, only after she has attended two session of her own mental health therapy. Brooke has not engaged with Drake Early Head Start consistently. Brooke is attending substance abuse treatment. She is providing drug screens for treatment. She has not provided drug screens for DHS as asked. [She] lacks insight as to why she and the children are court involved. Brooke is not consistently engaged in therapy services to help gain that insight, process her feelings of anger and frustrations, and address the reasons that the children were removed. Today Brooke reports that she does not [have] a good rapport with her individual therapist and that she is looking into a new one. It is important that Brooke is able to have open and

honest communication with her therapist. It is also important that Brooke address domestic violence with her advocate. Moving forward, Brooke will need to find a therapist to work with so that she can beg[i]n making therapeutic progress. Brooke needs to consistently attend her visits with the children. The children are in need of consistent ongoing therapy. The [guardian ad litem (GAL)] reports that the older children are doing well in the home of the paternal grandparents. [Thomas] has disengaged with services including visitation. [Terrell] is not involved with any services.

9. Brooke is consistent in her substance abuse treatment, including MAT, group and individual sessions, and her drug screens for treatment. The court is pleased to see that engagement.

10. Brooke clearly has a lot of anger and frustration with DHS and with the removal of her children. There is a lack of trust between her and any of the professional team members attempting to work with her. Brooke has expressed feeling that DHS has lied to the court, and does not recognize any positive work on her part. Her focus on her anger towards DHS is a barrier to her addressing the areas in her life that this court believes is necessary for reunification. Brooke and this team are encouraged to continue to work on building a relationship that facilitates trust and progress.

The court determined that placement with the intervenor was not in the children's best interest:

12. Brooke's mother has requested placement of all three children. . . . At the time of the children's initial removal, DHS did not recommend placement with [the maternal grandparents] due to their inappropriate behavior at the time that DHS was executing the removal. They were verbally aggressive with the worker, uncooperative, and told the children that children are molested in foster care. This is particularly concerning given that the maternal grandparents [are] licensed foster parents. The court agreed with the assessment the children should not be placed in their care, and confirmed that order at the Adjudication hearing and the Disposition hearing. Much like Brooke, [grandmother] has animosity towards DHS that creates difficulty in building a working relationship. [She] reports that she has a brain injury that affects her ability to emotionally regulate. As a result, [maternal grandmother] has been inappropriate with DHS and with providers. DHS reports that [she] frequently texts about placement of the children and visitation. When [she] does not get the response she wants, she becomes upset and the children are placed in the middle of it. For example, the maternal grandparents were not appropriate during a [family team meeting] and the facilitator had to direct them to stop talking. There is some question about whether this home will be able to maintain their foster

care/adoptive license. Four Oaks is requiring additional information from them before a determination can be made. In addition, DHS has concerns regarding whether [maternal grandmother] has the ability to provide care for the children. Both grandparents are on disability. [Grandmother] reports that she is paralyzed in her arm and hand. She also reports suffering negative [e]ffects from a brain injury she suffered. The children have expressed concerns regarding their grandfather's vision and ability to drive. DHS has asked for further medical documentation to determine whether there are any medical reasons that would prevent the maternal grandparents from providing care to the children. This court has ordered supervised visitation with the grandparents in the past because of the inappropriate conversations they have had with or in front of the children. To the grandmother's credit, she acknowledged and apologized for her behavior. However, she still lacks insight and understanding as to why the children were removed from her daughter, or why they have not been placed in her care. The court has responsibility to engage in concurrent planning as well as to minimize the number of moves these children experience. They are in concurrent homes at this time, although the youngest is separated from the older two. There is not current evidence that the grandparents will be able to be licensed to adopt these, nor that it would be in the children's best interest to be placed with them at this time.

*Permanency hearing.* The court scheduled a permanency hearing, which was held on May 20 and July 8. The court entered its order on July 8. In denying Brooke's request for a six-month extension, the court found:

Brooke has struggled to engage in services, to be open an[d] honest about her substance use disorder, and her mental health needs. She is resistive to DHS and her [Family-Centered Service (FCS)] provider. Brooke has been expected to engage in mental health services but testified on July 8, 2021[,] that prior to June 2021, she had only attended therapy a handful of times. Since June, she has seen her mental health provider only about [three] times. Her mental health provider also provides substance abuse counseling and she sees her once a month for substance abuse. In addition to taking her medication, Brooke is expected to attend multiple groups a week at UCS. Brooke has not consistently done so. Brooke tested positive for cocaine in March 2021. Brooke is unwilling to provide information about who she was with when using. She is also unwilling to share information about her romantic partners. Brooke isn't able to recognize why it is important for the court to know that she is around safe, stable individuals to help support her long term recovery.

Based on the progress that has been made, coupled with Brooke's resistance to working with providers, the court does not find an extension to be appropriate.

The court noted again that neither father had engaged in services. The court modified the permanency goal to termination of parental rights.

*Termination.* The permanency review and termination-of-parental-rights hearing was held on August 27 and 31, September 20 and 23, and October 18. The record indicates Thomas attended a few hours of the August 27 hearing but did not return after a break. He did not participate further. Thomas had provided no support for his children and had ceased all communication with DHS.

In her testimony Brooke acknowledged she had missed visits and appointments "in the past" but testified she was currently "doing what I'm supposed to be doing right now." Her individual USC counselor was providing co-occurring mental-health and substance-abuse sessions and she had attended six sessions in ten weeks. The individual sessions were conducted virtually. Her group sessions had returned to an in-person format in June; she attended five group sessions in June, four group sessions in July, and two in August. She was also speaking with a domestic violence advocate, had suitable housing, and employment. Brooke asked that the children be returned to her or that she be given more time to work toward reunification.

Brooke denied the children had ever witnessed the domestic violence between her and Terrell. She did not remember T.A. calling 911 and Brooke interrupting the call to state everything was fine. Brooke testified she did not think arguments and fights behind closed doors with her significant other were wrong; rather, it was "normal." She did not believe her abuse of prescription opiates was

a reason for removing the children because she "was taking care of that on my own." When asked about the reports she did not take feedback from service providers well, Brooke stated, "I have not been any—against them or anything they said to me. Since I was told take the feedback without fighting about it, without saying anything about it, I have not went against [Sarah] Swinton or anything she's stated." Brooke then called the State's attorney a "Dumb ass." And when asked if Brooke thought there was still work for her to do about her defensiveness, she responded: "No. . . . I simply don't like you."

Brooke continued to be angry with DHS. She stressed the affidavit supporting removal contained a lie—that she was going to be kicked out of MAT.[4] And she stated she believed DHS social worker Whitney Gamm was going to make money by adopting her three children out.

Amy Winters, Brooke's UCS Healthcare therapist, testified "from what she's shared with me, it would appear she has made progress." Winters stated, "I don't know enough about Brooke to give a professional opinion about [MAT] a program that I don't run." Winters also stated a number of times that she had only been working with Brooke since June. When asked about Brooke's apparent readiness to change, Winters stated Brooke was in the "accent stage." Winters could not remember Brooke's relapse risk. And, when asked what Brooke's prognosis was, Winters stated, "We're making progress."

---

[4] As noted in footnote 3, the affidavit notes only that "it's reported that the mother *may be dropped from the UCS treatment program for failure to meet.*" (Emphasis added.)

On September 20, Gamm testified and acknowledged Brooke was participating in recommended interactions with a domestic violence advocate, mental-health therapy, and substance-abuse treatment. Reports of Brooke's interactions during visits were generally positive.

Gamm, however, expressed concern because both Brooke's UCS treatment and diagnoses were unclear. She did not understand how Brooke was progressing through MAT programming and having her expectations lowered even though Brooke was not compliant with program expectations. Gamm was concerned because Brooke was asked by DHS to get drug screens on August 14 and December 21, 2020, and on February 17, 2021, but Brooke failed to show.[5] Gamm testified that when she met with Brooke in late March or early April, she was not aware Brooke had tested positive for cocaine at UCS because Brooke did not disclose that test result. She stated that while Brooke appeared to be refraining from opiates, she was experimenting with a new substance and the "cocaine positive wasn't found until she was ordered to re-sign a release because she had revoked [MAT's] release from the department." Consequently, in April when Brooke agreed to wear the sweat patch, which tested negative for all but methadone, DHS did not have a full picture. Then, on August 2, Brooke was again a no- show when DHS requested a drug screen. Gamm was questioned about Brooke's stated reason for not attending the August 2 drug screen—that she would have been late for work. Gamm responded she was offered a ride to the testing and:

---

[5] Brooke submitted a drug screen for MAT in March and the April 1 result indicated positive for cocaine. Brooke did not share this information with DHS.

> [Brooke] had indicated that her job was rather flexible, and in following up—when I followed up with her manager, they had indicated to me that they would have allowed her to go and be late, that they have a number of employees in similar situations, and they would have allowed her to be late to work had she dropped—or done a drug screen.

Gamm also expressed concern because UCS's drug screens were not completely random. Though drug screens did not occur every Thursday, Brooke knew she could be tested on Thursdays when she arrived to pick up her weekly doses.

Gamm testified Brooke had not yet taken accountability for DHS's involvement with the family and lacked insight about the effects of substance abuse and domestic violence on the children. Gamm testified insight and accountability are important: "For [a parent] to understand that the reason the department became involved were the safety concerns and helping them fix those issues and be supportive to them so that we return children to never have to become involved or re-remove children again."

With respect to Brooke's request the maternal grandmother and her significant other be allowed to be a placement for all three children, Gamm testified the maternal grandmother had failed to provide requested information concerning the brain injury she had suffered, resulting in her inability to regulate her emotions as well as physical disability, both of which countermanded safe placement of the children in her and her significant other's care.

DHS, the FCS provider, and the children's GAL all recommended termination of parental rights. The court terminated Thomas's rights under Iowa Code section 232.116(1)(b), (e), and (f) (2021). Brooke's rights were terminated

under paragraphs (d) and (*l*) as to all three children, (f) as to A.A. and T.A., and (h) as to Z.S.

Brooke and Thomas appeal. Brooke contests the grounds for termination, asserts the court should have allowed her additional time, claims termination is not in the children's best interests, and argues the court erred in denying her request to place all three children in a guardianship with the maternal grandparents. The father asserts the court should have granted him additional time to seek reunification and argues termination of his rights was not necessary because his children are safe in their placement with the paternal grandparents.

## II. Scope and Standard of review.

We review the termination of parental rights de novo, giving weight to the juvenile court's finding of facts. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). We give weight to the juvenile court's findings as to witness credibility because of its superior position to observe the witnesses and their demeanor. *See In re K.P.*, No. 13-0100, 2013 WL 1457845, at *4 (Iowa Ct. App. Apr. 10, 2013).

## III. Discussion.

*A. Three-step analysis and burden of proof:* When reviewing a termination of parental rights, we consider the three steps outlined in Iowa Code section 232.116: (1) whether the State's evidence supports a ground for termination; (2) whether termination is in the children's best interests; and (3) whether any exceptions to termination apply. *In re M.W.*, 876 N.W.2d 212, 219–20 (Iowa 2016). We look for clear and convincing evidence, that is, whether the State's proof leaves us with no "serious or substantial doubts" about the correctness of the juvenile court's conclusions of law. *Id.* at 219 (citation omitted).

It is the State's burden to prove grounds for termination exist by clear and convincing evidence; "the parent resisting termination bears the burden to establish an exception" under Iowa Code section 232.116(3). *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018).

*B. The mother's appeal.*

*Grounds exist.* Brooke contends the State did not prove the statutory grounds for termination. When, as here, the court rests its decision on more than one paragraph under section 232.116(1), we may affirm on any supported ground. *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). We will address paragraphs (f) and (h) as both require the State to prove a child has been adjudicated CINA, been out of the parent's custody for a specified statutory period, and cannot be returned to the parent "at the present time."[6] The mother contests only the issue of whether the children could safely be returned to her at the present time, meaning "at the time of the termination hearing." *See id.*

Brooke asserts that because she has a "proven commitment" to her children and has engaged with the provided services, she is in the same position as a parent whose termination was reversed in *In re C.Z.*, 956 N.W.2d 113 (Iowa 2021). In *C.Z.*, the supreme court found clear and convincing evidence was lacking that

---

[6] Iowa Code section 232.116(1)(f) is applicable to children (1) "four years of age or older" (2) who have been adjudicated CINA, (3) have been removed from the parent's physical custody "for at least twelve of the last eighteen months, or for the last twelve consecutive months," and (4) cannot be returned to the parent's custody "at the present time" without risk of adjudicatory harm.

Section 232.116(1)(h) is applicable to children (1) "three years of age or younger" (2) who have been adjudicated CINA, (3) have been removed "for at least six months of the last twelve months, or for the last six consecutive months," and (4) cannot be returned to the parent's custody "at the present time" without risk of adjudicatory harm.

the child could not have been safely returned to her father's custody, noting the father's consistent engagement with services and the testimony of "key witnesses" who recommended return of the child to the father. 956 N.W.2d at 123. The court wrote:

> The testimony of the therapist, counselor, and Early Access social worker showed the father's responsiveness to these services. The [court appointed special advocate] and [Family Safety, Risk, and Permanency (FSRP)] worker stated his visits with C.Z. were positive; he demonstrated an eagerness to learn how to care for his daughter and a concern with her well-being. The father attended most of the offered visits, while a few were cancelled due to C.Z. or her father not feeling well. Three DHS workers and the FSRP worker testified as to the father's responsiveness to services. Their testimony demonstrated the father's cooperation throughout the case and ultimately, all agreed that he was capable of caring for C.Z.
>
> The father violated a court order, drank alcohol after his relapse, and provided one tampered drug screen and a positive drug test. However, he showed remorse, admitted his alcohol use at the termination hearing, and provided negative drug screens after the tampered drug screen. He testified he had completely abstained from alcohol in the past few months and he understood that he should not have alcohol, as it had been a proven trigger.
>
> The father at times was less than forthcoming and showed poor judgment when he insulted the judge on a recorded line and when he delayed reporting his relapse. His relapse prompted DHS to seek termination. But he made amends and got back on track. DHS ultimately changed its position and recommended C.Z. be returned to her father.

*Id.*

There are some similarities between Brooke's position and C.Z.'s father—both relapsed and had bad judgment in insulting others.

There are notable differences as well. In *C.Z.*, the father had moved to four overnight visits per week, which continued for about thirty days. *Id.* at 116. He transported the child "to and from daycare, handled her medical appointments, and took care of her daily needs." *Id.* He continued working at the workplace where

he had been employed through the duration of the case. *Id.* In contrast, Brooke had not moved beyond supervised visits, had not attended the majority of her children's medical and mental-health appointments, and had changed employment during the course of the termination hearings. Brooke did not delay reporting her positive test for cocaine—she did not report it at all to DHS. Brooke has not shown a responsiveness to services or shown cooperation throughout the case. Rather, the testimony of Brooke's service providers was that Brooke had become more consistent after the permanency hearing, i.e. after the court changed the permanency goal to termination of parental rights and adoption.

On our de novo review, we concur in the juvenile court's assessment:

> Since the children's removal, Brooke has struggled with attending all her offered family interactions. She had to sign a visitation contract with her FCS worker to address visitation expectations. Those expectations included confirming visits, participating in CPP, and following FCS recommendations regarding parenting. Brooke has trouble accepting parenting direction from FCS. She becomes escalated and agitated in her communications with FCS and DHS. When attentive and focused, Brooke shows good parenting skills. However, when distracted, she misses her children's cues. Brooke provides consistent affection, but sometimes intrusive affection.
>
> Brooke is now seeing a therapist who provides both her substance abuse counseling and her mental health therapy. . . . Ms. Winters showed little awareness of Brooke's prior treatment history, substance abuse history, and current engagement with MAT. The therapist was unable to provide clear goals of what was being addressed in therapy. Ms. Winters was not aware of the recommendations for accountability by Brooke's prior therapist. Ms. Winters was defensive in her testimony, and the court was unable to gain useful information about Brooke's progress in addressing both her substance use and her mental health needs.
>
> Brooke's own testimony highlights the lack of progress she has made since the children's removal. Brooke still does not understand why her children were removed. She cannot see how her report to UCS regarding a daily opioid use would impact her ability to care for the children safely. Brooke testified that she lied about daily use in order to be admitted into the MAT. Even if the

court found that credible, it still demonstrates significant thinking errors on Brooke's part. Brooke is able to provide negative drug screens for her treatment provider, but those drug screens are not truly random. Brooke does not provide random drug screens when asked by DHS, even knowing that the court considers missed drug screens to be positive.

Brooke takes little accountability in how this case has progressed.

We are also concerned with Brooke's rejection of T.A.'s statements she witnessed domestic violence.

We acknowledge Brooke had *begun* to identify unhealthy behaviors and setting boundaries with others. And she has belatedly engaged with Early Head Start and CPP. It remains to be seen if Brooke can internalize the concepts she is learning. There is clear and convincing evidence the children could not be returned to Brooke's custody at the time of the hearing.

*Additional time is not warranted.* The juvenile court denied Brooke's request for additional time after the permanency hearing in July. We have set out the court's reasons above. After another four months, the mother only recently engaged with services on a more consistent basis. Therefore, we are not confident the need for removal will no longer exist after an additional six months. *See* Iowa Code § 232.104(2)(b).

*Best interests.* We next address Brooke's claim that termination of her parental rights is not the children's best interests. In determining a child's best interests, we are required to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." *Id.* § 232.116(2). "[T]he legislature 'has significantly, and not too subtly, identified a

child's safety and his or her need for a permanent home as the defining elements in a child's best interests.'" *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011) (citation omitted).

Two quotes from service providers sum up the children's need for safety and permanency. T.A. and A.A.'s Family Support Specialist noted in a May 17, 2021 report: "The uncertainty of not knowing their permanent placement has been taking a huge toll on the older children." And in June 2021, "Given [Z.S.'s] A[dverse] C[hildhood] E[xperiences] score, developmental stage, and his attachment needs it is imperative that a plan be developed to provide [Z.S.] with a long-term option for a safe and nurturing home." When written, the children had been out of the mother's custody for about a year.

Only after the permanency hearing did Brooke begin to more consistently engage in mental-health counseling and domestic-abuse services. Her therapist's notes indicate Brooke spent a great deal of time in her therapy sessions airing her grievances about DHS rather than addressing her own issues and needs. And, at the termination hearing, Brooke minimized the effects of domestic abuse on the children's well-being and minimized her mental-health needs and her own accountability in failing to engage in services. "Time is a critical element. A parent cannot wait until the eve of termination, after the statutory time periods for reunification have expired, to begin to express an interest in parenting." *In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000).

The children have been removed from parental care since June 2020. Despite having more than the statutory period to do so, Brooke has not successfully addressed her substance abuse or mental health or taken

accountability for the removal. A.A. and T.A. are placed together with their paternal grandparents who are willing to adopt if rights are terminated. A.A. and T.A. have been doing well in this home. Z.S., too, is placed in a home willing to adopt if rights are terminated. Both DHS and the GAL indicated that termination was in the best interests of these children. These children need and deserve permanency. We find termination of parental rights and adoption are in the children's best interests.

*No permissive factor precludes termination.* Brooke asserts the court need not terminate her rights because her mother is willing to be a guardian for the children. "[A] guardianship is not a legally preferable alternative to termination." *A.S.*, 906 N.W.2d at 477 (citation omitted). Guardianships do not provide true permanency because, "[b]y their very nature, guardianships can be modified or terminated." *In re E.A.*, No. 20-0849, 2020 WL 4498164, at *2 (Iowa Ct. App. Aug. 5, 2020) (citing *A.S.*, 906 N.W.2d at 477–78). We conclude the exceptions to termination do not apply. We affirm the mother's appeal.

*C. The father's appeal.* Thomas asserts in his appeal, "The juvenile court erred in terminating the Father's parental rights and in not granting additional time for reunification when Iowa Code [section] 232.116(3) applied as the child was placed with relatives." We first note the father did not seek additional time for reunification during the termination hearings. Consequently, that claim is not preserved for our review. *See In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012) ("[T]he general rule that appellate arguments must first be raised in the trial court applies to CINA and termination of parental rights cases.").

The father does not contest grounds for termination exist[7] but asserts, "There was no need to terminate his legal relationship with his children when the status quo could have been maintained in his own parents' home." We cannot agree.

"[O]nce the State has proven a ground for termination, the parent resisting termination bears the burden to establish an exception to termination." *A.S.*, 906 N.W.2d at 476. The father has not carried his burden. We have already noted "a guardianship is not a legally preferable alternative to termination." *Id.* at 477 (citation omitted). We will not keep T.A. and A.A. in limbo any longer. The paternal grandparents are ready and willing to adopt and provide the children with permanence. We affirm the termination of Thomas's parental rights to T.A. and A.A.

**AFFIRMED ON BOTH APPEALS.**

---

[7] Because the father does not contest the grounds for termination or the best-interests framework, we need not discuss the first two steps of the three-step analysis. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).